UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| JAMES F. MEADE,<br><br>Plaintiff,<br><br>-vs-<br><br>A.B. PROPERTY SERVICES, INC. d/b/a Happy Floors,<br><br>Defendant. | Civil Action No.: 4:14-cv-2947-RBH-TER<br><br>**REPORT AND RECOMMENDATION** |

## I. INTRODUCTION

This action arises out of Plaintiff's termination with Defendant. Plaintiff alleges that Defendant terminated his employment in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq. Plaintiff originally filed this action in the Horry County Court of Common Pleas on June 25, 2014. Defendant removed it to this court on July 24, 2014, pursuant to 28 U.S.C. § 1331. Presently before the court is Defendant's Motion for Summary Judgment (Document # 33). After an extension of time, Plaintiff timely filed his Response (Document # 40). All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. This report and recommendation is entered for review by the district judge.

## II. FACTS

### A. Defendant Happy Floors

Defendant is a Florida corporation with its principal place of business in Miami, Florida. Defendant's Local Rule 26.03 Answers to Interrogatories (Document # 8) p. 1. Elie Elbaz and Sol

Bonan are the principal owners and officers of the company. Def. Dep.[1] 10-11 (Ex. 2 to Pl. Resp.). Elbaz started the company and is in charge of "everything" concerning the company. Def. Dep. 9; 101. Defendant is engaged in the business of selling tile to customers. Def. Dep. 15-16. Defendant imports tile from Italy and Spain, and sells it to customers located primarily in the United States. Def. Dep. 15-19. Defendant sells tile to customers through two different sales models: retail sales and Architecture and Design (A&D) sales. Pl. Dep. 45-54, 65-67, 121 (Ex. 1 to Pl. Resp.); Def. Dep. 20- 25.

In the retail sales model, sales representatives for Defendant travel to showrooms that sell tile directly to consumers. Pl. Dep. 45-47; Def. Dep. 20-22. Defendant refers to the showroom as a "dealer," and the dealer or showroom is Defendant's customer in the retail sales model. Def. Dep. 20-22. Once the Defendant sales representative arrives at a showroom, he or she meets with the decision-makers, educates them about Defendant's tile, and attempts to place a display in the showroom. Pl. Dep. 46-47. If a consumer purchases Defendant's tile from the showroom, Defendant makes money from the sale. Pl. Dep. 48.

In June or July of 2011, Elbaz decided to invest in developing the A&D sales model. Def. Dep. 33, 58-59, 61. In the A&D sales model, Defendant's sales representatives travel to architecture firms to meet with architects and designers, who make specifications for construction projects. Pl. Dep. 48-49, 65-67. During these meetings, Defendant sales representatives provide information about Defendant's tile, show samples of Defendant's tile, and attempt to leave architectural binders with the firm, which contain samples of Defendant's products. Pl. Dep. 48-50, 53-54. The hope is that an architect or designer will specify Defendant's tile for an upcoming construction project. Pl.

[1]"Def. Dep." refers to the Fed.R.Civ.P. 30(b)(6) deposition of Defendant Happy Floors, given by Elie Elbaz.

Dep. 53-54, 65-67; Def. Dep. 24-25. If so, the specification for Defendant's tile is included in the plans for the project. Pl. Dep. 50-51, 65-66. Then, once the project is awarded to a general contractor, a subcontractor purchases the tile directly from Defendant. Pl. Dep. 50-51, 121. Defendant makes money when the subcontractor purchases the specified tile from Defendant. Def. Dep. 50-51, 121.

**B. Plaintiff's Employment with Defendant**

In the summer of 2011, James Nowicki, Defendant's national sales manager, began discussing A&D employment with Plaintiff.[2] Prior to Plaintiff being hired, he had four discussions with Nowicki regarding the concept of an A&D sales division. Pl. Dep. 126-27. After the third conversation, he sent an email to Nowicki, dated June 29, 2011, in which he stated, "I realize everything has to make 'good business sense' for the owners and management team" with respect to Defendant hiring him and developing the "A&D segment of the business." Pl. Dep. 125-27; Email from Plaintiff dated June 29, 2011 (Ex. to Def. Motion). According to Elbaz, during the process of interviewing Plaintiff, Plaintiff requested that he give him one year to prove himself and the A&D division. Def. Dep. 33, 37.

Defendant initially focused the A&D department in the South Florida market, "from Orlando, south." Def. Dep. 60. Later, Defendant decided to expand the A&D division nationwide. Def. Dep. 60-61. Defendant hired Plaintiff on September 1, 2011. Pl. Dep. 96. Plaintiff testified that Defendant hired him as A&D manager. Pl. Dep. 96. Defendant testified that it hired him as an A&D

---

[2]Plaintiff was previously hired by Defendant in October 2007 as the northeastern regional sales manager. Pl. Dep. 16; 26-28. Plaintiff remained employed as the northeastern regional sales manager until January 2011, when he resigned to work as a salesman for a competitor. Pl. Dep. 26-28. In June or July of 2011, however, Plaintiff began communicating with Nowicki about returning to Defendant in a different capacity. Pl. Dep. 34.

salesman who the company was grooming to be an A&D manager after he developed the area and was capable of bringing in revenue. Def. Dep. 33, 93. In fact, Plaintiff was the first A&D employee Defendant hired after deciding to take the program nationwide. Def. Dep. 96-97. According to Defendant, the geographic sales area of the nationwide A&D department was "[a]nywhere we can get a sale," and Plaintiff's sales territory was "[t]echnically everywhere." Def. Dep. 61, 95.

Plaintiff worked from home in Myrtle Beach, South Carolina when not traveling on A&D business. Pl. Dep. 102-03. From home, Plaintiff scheduled and participated in teleconferences with the A&D sales force. Pl. Dep. 103-04. Plaintiff also contacted architectural firms to schedule upcoming meetings for he and the A&D sales force. Pl. Dep. 103-04, 107. Defendant never provided Plaintiff with any sales quotas or any numerical sales expectations of any kind during his time as A&D manager. Pl. Dep. 69; Def. Dep. 89. Furthermore, Defendant never informed Plaintiff that either he or the A&D Department would be subject to any type of review, annual or otherwise. Pl. Dep. 69, 145. Plaintiff admitted that he never knew whether the A&D sales division was, in fact, profitable during his management/employment. Pl. Dep. 130. During the course of Plaintiff's employment in A&D sales, he neither monitored sales ultimately placed by designers, nor received reports of sales generated by A&D. Plaintiff Dep. 59. He received no written information that would indicate the sale or orders generated through his efforts in A&D nor was he privy to the A&D sales representatives' expenses. Pl. Dep. 68, 119. Nowicki managed their expenses, and he managed their sales. Pl. Dep. 119-120. Plaintiff did not know what regions were generating the most sales or the most specifications. Pl. Dep. 244, 245.

While with the A&D division, Plaintiff was never disciplined for poor job performance, nor given any type of verbal reprimand. Def. Dep. 72-73, 218. Plaintiff testified that James Nowicki, Defendant's national sales manager and Plaintiff's direct supervisor, provided Plaintiff with verbal

assurances that the A&D department was exceeding expectations under Plaintiff's leadership. Pl. Dep. 92-94, 131, 211-12.

Plaintiff testifies that in September 2012, Nowicki notified him that Defendant would hold "a year-end sales meeting" with all A&D staff in December 2012 to discuss the upcoming year, 2013. Pl. Dep. 70-71, 141-42, 204-07; Email from Plaintiff dated October 29, 2012 (Ex. 6 to Pl. Resp.). This year-end A&D sales meeting would be held in conjunction with Defendant's annual sales meeting, which also took place in December. Pl. Dep. 70-71, 141-42. Nowicki told Plaintiff that he would be responsible for leading the A&D sales meeting in December 2012. Pl. Dep. 70. Nowicki asked Plaintiff "to put together a point of interest for he and Eli [Elbaz] to review so we could discuss to make the meeting very productive and beneficial for all involved." Pl. Dep. 141-42.

Plaintiff sent an email to Nowicki on October 1, 2012 with the subject line that read, "End of Year Review." Pl. Dep. 141-42; Email from Plaintiff dated October 1, 2012 (Ex. 4 to Pl. Resp.). In the email, Plaintiff asked for an end of the year meeting with "HF Mgmt" to discuss his performance and his role with the Florida A&D sales representatives, Ms. Alvarez and Mr. Kapper. Email from Plaintiff dated October 1, 2012. Plaintiff requested this meeting because after his conversation with Mr. Nowicki in September 2012, he expected to receive a raise.[3] Pl. Dep. 71.

### C. Expectations and Actual Performance of A&D Sales Model

Defendant expected that the A&D sales division would be profitable. Def. Dep. 73. It has a benchmark of $1,000,000.00 in annual sales per person in the dealer market. Def. 73-74. Defendant expected the same sales to be generated from A&D sales representatives. Def. Dep. 74.

[3]Plaintiff testified that he expected a raise because Nowicki told him the A&D department was performing "great;" the A&D department planned on expanding by hiring additional sales representatives; and Gibbs, his subordinate, was receiving a raise at the year-end meeting. Pl. Dep. 92-94, 205-06, 212.

Defendant expected to see a profit within one year of starting the A&D venture. Def. Dep. 75. Defendant informed all pure A&D sales representatives (Plaintiff and Marlene Alvarez) upon hire that he expected their sales to sustain themselves, or allow the company to break even. Def. Dep. 88-89. Defendant explained, in sum, his arrangement with Plaintiff as follows: "Jim came into the table, just to build [A&D]. . . . And he tried. And we tried to give him all the support we can, but he understood that it has to be built in one year, if not, the whole deal is going down." Def. Dep. 93.

Plaintiff recalls that, in September 2012, Nowikci informed Plaintiff of the status of the A&D department and of the plans to expand the department in the future. Pl. Dep. 92-94, 205-06. Nowicki told Plaintiff that the A&D department was performing "great" and that the company planned on hiring additional A&D sales representatives. Pl. Dep. 92-94, 205-06. Nowicki also stated that Mr. Gibbs would receive a raise at the year-end meeting. Pl. Dep. 212. However, Elbabaz testified that A&D sales were so minimal that, even if the sales were multiplied by ten, the A&D sales representatives would still not break even or become eligible for a commission. Def. Dep. 54-55. In addition, in August of 2012, one of Defendant's competitors began soliciting Defendant's sales representatives, including Michael Gallup, who quit on August 31, 2012. Def. Dep. 156. On or about September 17-18, 2012, Defendant was notified that another salesperson in New Jersey, Jeffrey Estevez, was solicited as well, giving his two weeks' notice. Def. Dep. 156. Estevez explained that he had been offered more money by the competitor. Def. Dep. 156. Fearing he was "going to lose all the salespeople" and, with that, also lose "all the sales in the northeast," at the end of September, Elbaz decided that he "had to find money to pay all the people. . . . " Def. Dep. 156-57). Elbaz explained he needed "more money, more budgets." Def. Dep. 157.

Around the same time, Elbaz received the October 1, 2012, email from Plaintiff requesting an end of the year review. Def. Dep. 157. In its position statement to the Equal Employment

Opportunity Commission (EEOC), dated May 23, 2013, and its written discovery responses, dated August 28, 2014 and November 7, 2014, Defendant stated it made the decision to terminate Plaintiff during "the first week of October 2012." See Documents bates stamped as Defendant's Discovery Responses 000163-000165 (Ex. 17 to Pl. Resp.); Defendant's Local Rule 26.03 Answers to Interrogatories (Document # 8); Defendant's Answers to Plaintiff's First Set of Interrogatories #11 (Ex. 7 to Pl. Resp.). However, during his deposition Elbaz testified that he decided to close the A&D department around October 15th or 16th of 2012, in an effort to free up enough money to keep the salespeople in the northeast market that he was concerned of losing to competitors. Def. Dep. 157-58. He further testified that he made the decision at that time to terminate Plaintiff's employment. Def. Dep. 222.

Elbaz further testified that he attempted to communicate its decision to Plaintiff on October 16th or 17th, but was unable to reach him. Elbaz testified that he tried to call Plaintiff on both his company phone and personal phone immediately after he made the decision to close the department on October 16th or 17th, but both were disconnected and he was "off the radar" and unable to be tracked via GPS. Def. Dep. 260; 242, 244. "His computers were off, everything was off, he was not logging in, we see when he logs in, we can see his computer, we can see his iPhone, we can see what the location is, and everything in a normal day, but everything was off. We didn't know what's going on." Def. Dep. 261.

In the beginning of November, Elbaz flew to New York to meet with all of the salespeople and informed them that Defendant was closing the A&D department and would be focusing only on the retail sales model. Def. Dep. 161.

**D. Plaintiff's Alcohol Use**

Leading up to October 12, 2012, Plaintiff struggled with alcoholism for a number of years.

Pl. Dep. 7-8; Sloan Dep. 20-21, 35-36 (Ex. 3 to Pl. Resp.). Plaintiff's counselor, Theresa Sloan, of McCarthy Counseling Associates, diagnosed Plaintiff with alcoholism on September 28, 2009, and on June 14, 2012. Sloan Dep. 20-21, 35-36. Initially, on September 28, 2009, Sloan diagnosed Plaintiff as suffering from a form of alcoholism known as alcohol abuse. Sloan Dep. 20-21. Later, in June 2012, Sloan diagnosed Plaintiff as suffering from a more severe form of alcoholism known as alcohol dependence.[4] Sloan Dep. 35-36. In June 2012, Sloan concluded Plaintiff was an "addictive" alcohol user, who engaged in "excessive" alcohol use. Sloan Dep. 37-38. Plaintiff first sought treatment for alcoholism in 2005 or 2006. Pl. Dep. 7-8. Plaintiff continued to receive treatment for alcoholism during his employment with Defendant. Pl. Dep. 145.

On the evening of Friday, October 12, 2012, Plaintiff began drinking alcohol excessively. Pl. Dep. 168-69, 171. Plaintiff continued drinking alcohol excessively the following day. Pl. Dep. 169, 171. On Sunday, October 14, 2012, Mr. Meade woke up, and he consumed no alcohol that morning as he prepared to fly to Philadelphia to attend A&D meetings beginning on Monday, October 15, 2012. Pl. Dep. 171-73. As soon as Plaintiff arrived in Philadelphia on Sunday evening, he began consuming alcohol. Pl. Dep. 166, 171-73. Plaintiff consumed so much alcohol that when he awoke on Monday, Otober 15, 2012, he was in no condition to work. Pl. Dep. 166, 173. On Monday morning, Plaintiff sent a text message to Nowicki requesting permission to take "personal time." Pl. Dep. 173. Nowicki responded with a text message that read, "[t]ake as much as you need." Pl. Dep. 173. Plaintiff cancelled his meetings and informed Nowicki that he was "flying home to Myrtle Beach on my own expense." Pl. Dep. 173. When Plaintiff returned to Myrtle Beach on Monday,

---

[4]The terms "alcohol abuse" and "alcohol dependence" are no longer clinically used. Sloan Dep. 66. Both of these diagnoses have merged to a new clinical term, "alcohol use disorder." Sloan Dep. 20-21, 66.

October 15, 2012, he immediately began drinking alcohol. Pl. Dep. 174. Plaintiff continued drinking alcohol throughout Monday, October 15, 2012, Tuesday, October 16, 2012, and Wednesday, October 17, 2012. Pl. Dep. 174. On Thursday, October 18, 2012, Plaintiff made an emergency visit to Sloan's office. Pl. Dep. 163-64, 174. Upon arrival, Plaintiff informed Sloan that he "wanted to change [his] life, and after some discussion and a telephone call between Sloan and Plaintiff's wife, Plaintiff agreed to enter Wilmington Treatment Center to receive treatment for alcoholism. Pl. Dep. 176-78. Plaintiff decided to enter a rehabilitation treatment center because alcoholism interfered with his work on this occasion. Pl. Dep. 175-76. The following colloquy occurred during Plaintiff's deposition:

> Q. What about this drinking binge, Mr. Meade, made you now want to go to rehab?
> A. Because I had it suggested in the past. And I had never allowed it to interfere with my work.
> Q. When you say "interfere with your work," you're talking about when you woke up—
> A. Taking time away, to ask for personal time to deal with my personal situation.
> Q. Got it. So that is when you believed it had become a problem?
> A. Yes.

Pl. Dep. 175-76.

Plaintiff entered Wilmington Treatment Center on Thursday, October 18, 2012. Pl. Dep. 178. On October 18 or 19, 2012, Plaintiff's wife, Julie Meade, called Nowicki to notify him that Plaintiff was currently receiving treatment for a medical issue.[5] Pl. Dep. 96, 195-96; Def. Dep. 230, 233, 236-37, 241-42. Mrs. Meade further informed Nowicki that Plaintiff would need time away from work while he received treatment. Def. Dep. 230. Defendant testified that Plaintiff's requested leave

[5] In its memorandum, Defendant argues it did not take Mrs. Meade's call "seriously" because of alleged previous marital discord between Plaintiff and his wife. However, the evidence in the record reveals only that Defendant had "no idea" whether Plaintiff and his wife were together when she called Mr. Nowicki. Def. Dep. 240-41.

during October 2012 "was not approved ... but it was not disapproved." Def. Dep. 241. When questioned during the deposition, "Well, you knew that he [Plaintiff] was–that he was checked into a clinic?" Def. Dep. 241, Defendant responded, "Yeah, but clinic, you can go have a hair cut I mean." Def. Dep. 241. On October 23, 2012, Mr. Meade checked out of the Wilmington Treatment Center and returned to his home in Myrtle Beach, where he resumed receiving treatment from Sloan. Pl. Dep. 189-90.

**E. Plaintiff's Termination**

At 10:23 a.m. on October 26, 2012, prior to an appointment with Sloan, Plaintiff sent an email to Nowicki, informing him of his alcoholism and the treatment received during his absence from work. Pl. Dep. 193; Email from Plaintiff dated October 26, 2012 (Ex. 5 to Pl. Resp.); Def. Dep. 246. This was the first occasion that Plaintiff notified Defendant of his alcoholism. Pl. Dep. 194-95. In the email, Plaintiff explained, "I voluntarily checked myself into a treatment clinic last week when I was honest with myself regarding my problem." Email from James Meade dated October 26, 2012. Plaintiff further stated he "was taking the necessary steps to be clean and sober of my alcohol abuse." Email from James Meade dated October 26, 2012. Plaintiff continued, "I am inquiring about my status with the company and what direction I must prepare for the future. I am completely confident that a clean and sober Jim Meade can be a strong asset to the HF organization and family." Email from James Meade dated October 26, 2012.

At 12:15 p.m. on October 26, 2012, Nowicki sent an email response to Plaintiff, informing him of his termination. Email from James Nowicki dated October 26, 2012 (Ex. 6 to Pl. Resp.); Def. Dep. 246- 47, 253. Defendant testified specifically that Nowicki's email at 12:15 p.m. on October 26, 2012, was "in response" to Plaintiff's email from earlier that day. Def. Dep. 253. Defendant further testified that they "let [Plaintiff] go" in response to his October 26, 2012, email. Def. Dep.

253. Specifically, Defendant testified as follows:

Q. ... So on October 26, 2012, Mr. Meade brings it to Happy Floors' attention, that he has an alcohol abuse problem. Okay?
A. Yeah.
Q. And what does Happy Floors do in response?
A. Jim [Nowicki] tells him that we close the department already.
Q. They fire him?
A. Let go.
Q. They let him go.
A. Yes.
Q. That's what they do in response?
A. Yeah.

Def. Dep. 253.

Defendant had not provided Plaintiff with any previous notice that his job may be terminated prior to Nowicki's email on October 26, 2012. Def. Dep. 262-63; Plaintiff Dep. 204. In his email, Nowicki stated that after "meeting with Elie [Elbaz] & Sol [Bonan]," the shareholders of Defendant, and "stud[ying] the program," Defendant decided to "suspend" the A&D program and would no longer need Plaintiff's services.[6] Email from James Nowicki dated October 26, 2012.

Plaintiff responded to Nowicki's termination email on October 29, 2012. Email from James Meade dated October 29, 2012 (Ex. 6 to Pl. Resp.). In Plaintiff's email, he expressed confusion about Defendant's decision to terminate him, as he felt it was contradictory to his discussions with Nowicki in September 2012. Email from James Meade dated October 29, 2012; Pl. Dep. 204-07. Plaintiff also questioned Defendant's suspension of the A&D program. Email from James Meade dated October 29, 2012. In his email, Plaintiff stated:

I must question the timing of this ultimate decision to suspend the program when it

[6] Elbaz, on behalf of Defendant, testified that he did not remember any meeting between he, Nowicki, and Sol Bonan about suspending the A&D program as stated by Nowicki in his email. Def. Dep. 254-55. Elbaz testified that he, alone, made the decision to terminate Plaintiff and suspend the A&D program. Def. Dep. 222, 259-60.

> is completely contradictory to our previous conversations just as of three weeks ago for the following reasons:
> 1. End of the Year meeting in December with ALL A&D personnel to discuss 2013.
> 2. Acquisition of additional sales staff in specific areas of the country to free current sales staff to focus on A&D.
> 3. HF's continual growth mode & sales revenues during 2012
> 4. Addition of Marlene [Alvarez]
> 5. No conversation or correspondence with me regarding any discussions of termination of the program or my position was in jeopardy
> 6. I reside in the south and my services were verbally reinforced on numerous occasions within the past 4-6 weeks
> 7. My position is the only one terminated.

Email from James Meade dated October 29, 2012.

**F. Winding up the A&D Division**

By the time of his termination, Plaintiff was considered an A&D Sales Manager. Def. Dep. 150. After his termination, Nowicki assumed his duties. Def. Dep. 150. However, Defendant ceased reviewing sales reports from that point forward since, according to Elbaz, "[w]e knew that we were going to close the department, so we kind of didn't care anymore." Def. Dep. 150. Elbaz explained the closing process: "We just let it go. Let it weed off. The reason we didn't close everything in one shot, because there was some sales cooking in that period. So, we didn't want to just stop it, . . . people will call certain phone, no one answer. So we want to salvage some sales. That's the reason after that, we let go Marlene, I think, in July. The next year." Def. Dep. 150-51.

On that same day that Elbaz made the decision to close the A&D division and terminate Plaintiff's employment, October 15th or 16th, Defendant ceased buying new displays and merchandising for the A&D division. Def. Dep. 222, 275. A&D was removed from the company's budget. Def. Dep. 275. Any new brochures or similar items received after that date were the result of an old order. Def. Dep. 275. After Plaintiff's termination, no one continued traveling with the A&D sales representatives. Def. Dep. 151.

Defendant posted a job opening in the A&D department on the website monster.com on December 7, 2012. Document bates stamped as PLF 00117 (Ex. 12 to Pl. Resp.); Def. Dep. 111-12, 115. However, Elbaz testified that he was actually seeking someone for a dealers position, but advertised it as an A&D position because he was seeking to replace someone else in a dealers position who he felt was going to quit and he did not want that person to know that he was advertising his position. Def. Dep. 112-16.

In the year 2012, Defendant terminated no other A&D employee other than Plaintiff. Def. Dep. 266-67. Gibbs was terminated February 28, 2013 and Ms. Alvarez was terminated in July 2013. Def. Dep. 269. Defendant fired Alvarez because "she didn't produce." Def. Dep. 268. Elbaz testified that she brought a list of connections with her, such as the Miami Airport and the Fort Lauderdale Airport, which represented to him millions of dollars in sales, but saw nothing from her after six months of employment. Def. Dep. 268. Defendant fired Gibbs because he was only kept on as a backup for the dealers (retail) market in Atlanta, and they no longer needed him as a backup employee. Def. Dep. 132, 269. David Kapper, a hybrid sales representative, who sold tile through both the retail sales model and the A&D sales model, quit on January 11, 2014. Pl. Dep. 97; Def. Dep. 128-29, 135-36, 270; Defendant's Answer to Plaintiff's Second Set of Interrogatories #24 (Ex. 8 to Pl. Resp.). Craig Clayton remained employed with a primary focus on retail, not A&D. Def. Dep. 270. Clayton was instructed by Elbaz "not to touch A&D" approximately two years ago. Def. Dep. 126-27. Clayton is a general sales employee who contacts some old A&D customers, but all displays and sales materials have been destroyed. Def. Dep. 128. Happy Floors no longer has an A&D sales division. Boccia Aff. ¶ (Ex. to Def. Motion). However, as of May 21, 2015, the date of the 30(b)(6) deposition of Defendant, Defendant continued to sell tile through the A&D department. Def. Dep. 127-28, 268; Documents bates stamped as PLF 00118- 00120.

### G. Administrative Remedies

Following his termination, Plaintiff filed a charge of discrimination with the South Carolina Human Affairs Commission on April 15, 2013. Compl. ¶ 34. In the charge of discrimination, Plaintiff alleged Defendant terminated him in violation of the ADA. Compl. ¶ 34. After Plaintiff received a right to sue letter, he commenced this lawsuit.

## III. STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, the moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Id. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th

Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV. DISCUSSION

The ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Violations of the ADA occur when the employer either wrongfully discharges a qualified individual with a disability or fails to make reasonable accommodations for him. Rhoads v. F.D.I.C., 257 F.3d 373, 387 n. 11 (4th Cir.2001).

The Fourth Circuit has held that the causation and burden-shifting standards applicable in Title VII cases as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)[7] are also applicable in cases brought pursuant to the ADA "where the defendant

---

[7] The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

disavows any reliance on discriminatory reasons for its adverse employment action." Ennis v. Nat'l Assoc. Of Business and Educ. Radio, 53 F.3d 55, 58 (4th Cir.1995). Under the analysis set forth in McDonnell Douglas, Plaintiff has the initial burden of demonstrating a prima facie case of discrimination. Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002). If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the Plaintiff's discharge. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. Reeves, 530 U.S. at 143.

To establish a prima facie case of discriminatory discharge under the ADA, a plaintiff must show that (1) she was a "qualified individual with a disability;" (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination. Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir.2001). Although Defendant notes in its motion that it does not concede that what Defendant characterizes as Plaintiff's "intermittent weekend binge drinking" is a qualified disability under the ADA, it does, for purposes of the motion, concede that Plaintiff has stated a prima facie case of discrimination under the ADA. Def. Mem. p. 21. Thus, the burden shifts to Defendant to produce a legitimate, non-discriminatory reason for Plaintiff's termination.

Defendant asserts that the reason for terminating Plaintiff's employment was because it was eliminating the entire A&D division he managed due to its lack of profitability, a problem

exacerbated by the fact that the company needed to budget additional funds to increase the salaries and/or commissions of the company's northeastern dealer sales representatives (who were being recruited by a competitor). Elbaz explained that his decision had nothing to do with Plaintiff's performance, and that, in fact, he did not even review Plaintiff's individual sales figures. Def. Dep. 128, 176. Rather, he reviewed the sales of the whole division relative to expenses to ascertain profitability. Because the division was unprofitable, it was closed. Def. Dep. 183-84. Plaintiff acknowledged both prior to being hired and during his deposition testimony that the A&D division was a new venture that needed to make "good business sense" by being profitable. Pl. Dep. 59.

Because Defendant has produced a legitimate, non-discriminatory reason for Plaintiff's termination, the burden returns to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. Reeves, 530 U.S. at 143. Plaintiff first argues that Defendant's reason for Plaintiff's termination is unworthy of credence. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Reeves, 530 U.S. at 147; see St. Mary's, 509 U.S. at 517 ("Proving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."). "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves, 530 U.S. at 147.

Plaintiff argues that the Defendant's explanation that it terminated Plaintiff's employment because it closed the A&D department is false because Defendant has taken no action to suspend the A&D program either on October 26, 2012, or at any later point in time. Plaintiff argues that none of the other A&D employees were terminated in 2012, and those that were terminated, Alvarez and

Gibbs, were terminated four and nine months after Plaintiff, respectively. However, Elbaz testified that Gibbs was kept on as a backup for the retail market in Atlanta, and he decided in February of 2013, that he no longer needed a backup employee. One employee, Kapper remained employed until he quit in January of 2014, but he was a hybrid sales employee who was already bringing in money outside the A&D sales. Def. Dep. 267. The other employee, Clayton, who was also a hybrid sales employee, continues to be employed by Defendant, and although he services some A&D accounts, his primary focus is on retail. Elbaz testified that he did not close the entire A&D department at one time because "there was some sales cooking in that period. So, we didn't want to just stop it, . . . people will call certain phone, no one answer. So we want to salvage some sales." Def. Dep. 150-51.

Plaintiff also argues that Defendant continues to sell tile to customers through the A&D sales model. Elbaz testified that Clayton continues to service some previous A&D customers but all displays and sales materials have been destroyed and Clayton was told approximately two years ago not to contact any new, potential A&D clients. Def. Dep. 128.

Finally, as evidence that Defendant's reason for terminating Plaintiff is unworthy of credence, Plaintiff argues that Defendant placed an ad on monster.com for a job opening in the A&D department. However, Elbaz testified that he was actually seeking someone for a dealers position, but advertised it as an A&D position because he was seeking to replace someone else in a dealers position who he felt was going to quit and he did not want that person to know that he was advertising his position. Def. Dep. 112-16.

Many of these actions taken by Defendant are consistent with a company gradually shutting down a division of business and, alone, are insufficient to establish pretext. However, cumulatively, Plaintiff presents an issue of fact as to pretext. In addition to the monster.com ad, the other A&D employees remained with Defendant for several months after Plaintiff's termination, and Plaintiff

was terminated first, with no prior discussion or indication that his job was in jeopardy.[8] Also, Plaintiff argues that the timing of Plaintiff's termination gives rise to pretext. Close temporal proximity can serve as evidence of pretext. See, e.g., Warren v. Halstead Indus., Inc., 802 F.2d 746, 758 (4th Cir. 1986) (noting that close temporal proximity, here thirteen days, combined with other relevant evidence can give rise to an inference of pretext); Moss v. City of Abbeville, 740 F.Supp.2d 738, 746 (D.S.C. 2010) (holding that sufficiently close temporal proximity, here three months, may give rise to an inference of pretext); Blasic v. Chugach Support Servs., Inc., 673 F.Supp.2d 389, 400 (D.Md. 2009) (finding that an adverse employment action closely following protected activity, here one week, is one of several factors, which when combined, may support an inference of pretext).

Plaintiff was notified of his termination on October 26, 2012, only two hours after he informed Nowicki of his recent treatment for alcoholism. Although Elbaz testified that he made the decision to close the A&D department and terminate Plaintiff's employment before he was notified of Plaintiff's alcoholism, there are no documents in the record to indicate that the decision was made then. Although Defendant has produced documents showing the poor sales numbers of the A&D Department, Exhibits 11-19 of Defendant's Deposition (Ex. 18 to Pl. Resp.), these documents were created after Plaintiff's termination and, with one exception, after this lawsuit was filed on June 25, 2014. Def. Dep. 173-74,179, 180-81, 190-91, 193-94, 196, 201-02, 204-05, 208-09, 215.

Plaintiff testified that Nowicki notified him in September of 2012 Defendant would hold "a year-end sales meeting" in December 2012 to discuss the upcoming year, 2013, and that Nowicki

---

[8]Defendant produced calculations purporting to show Plaintiff's salary and expenses as a percentage of the A&D department's deficit, as well as Gibbs' and Alvarez's salary and expenses. Def. Dep. Ex. 11. It is noted that the percentages considered cumulatively far exceed one hundred percent. Nonetheless, while this may be evidence supporting Defendant's argument, as set forth below, Plaintiff creates an issue of fact as to pretext.

wanted Plaintiff to put together some information for he and Elbaz to review so they would have some things to discuss to make the meeting productive. Plaintiff also testified that Nowicki told him in September of 2012 that the A&D department was performing "great," the A&D department planned on expanding by hiring additional sales representatives, and Gibbs, his subordinate, was receiving a raise at the year-end meeting. Although this information was communicated to Plaintiff by Nowicki rather than Elbaz, because the court must view the evidence in the light most favorable to Plaintiff, it is probative on the question of the timing of the decision to close the A&D department and terminate Plaintiff's employment.[9]

In addition, Defendant has offered inconsistent statements as to when the decision to terminate Plaintiff was made. In its position statement to the EEOC on May 23, 2013, and its written discovery responses, dated August 28, 2014 and November 7, 2014, Defendant stated it made the decision to terminate Plaintiff during "the first week of October 2012." In his response, Plaintiff notes that this timing begs the question of why Plaintiff was not notified of his termination prior to October 26, 2012. In his deposition, Elbaz testified that the decision was made on either October 15th or 16th. At that time, Plaintiff was not at work and could not be contacted by phone.[10] Inconsistent statements by a defendant can be evidence of pretext.[11] See Holland v. Washington

[9] Also, it is noted, as discussed above, Elbaz testified that he alone made the decision to terminate Plaintiff and suspend the A&D program, while Nowicki's email to Plaintiff notifying him of his termination states that he met with Elbaz and Sol Bonan, and they decided together to close the A&D division and terminate Plaintiff's employment.

[10] The undersigned notes that Plaintiff's termination was communicated to him on October 26, 2012, via email, yet there is no indication in the record that Elbaz or anyone else attempted to contact Plaintiff via email on October 16th or 17th, when they state they initially tried to contact Plaintiff to inform him of his termination.

[11] Defendant argues that Elbaz reviewed his notes just prior to his deposition, which refreshed his recollection that the decision was made in the middle of October rather than the beginning of October. Nevertheless, determination of this dispute of fact is for a jury to decide.

Homes, Inc., 487 F.3d 208, 217 n. 7 (4th Cir. 2007) ("[W]hen a company changes its story after it cannot support its initial story, there is an obvious issue of pretext.").

When considered as a whole, the facts that other A&D employees remained with Defendant for several months or more after Plaintiff's termination with no explanation for why he was terminated first, that Plaintiff was terminated two hours after he first notified Defendant of his alcoholism, the lack of documentation to show that the decision was made prior to notification of Plaintiff's alcoholism, and the inconsistent statements at to when the decision to terminate Plaintiff was made, are sufficient to create an issue of fact as to pretext. That is, Plaintiff has presented sufficient evidence to create an issue of fact as to whether the reason given for Plaintiff's termination was actually pretext for a discriminatory reason and, thus, summary judgment is inappropriate.

## V. CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (Document # 33) be denied.

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

January 14, 2016
Florence, South Carolina